IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JOEL D. VANDERKROL, | 4:16-cv-00293-RGE-CFB |
| Plaintiff, | |
| vs. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | REPORT AND RECOMMENDATION |
| Defendant. | |

Plaintiff Joel D. Vanderkrol moves for reversal of Defendant Social Security

Commissioner's decision denying his claim for disability insurance benefits (DIB) under Title II

of the Social Security Act, 42 U.S.C. §§ 401–434 (2015), or alternatively, for remand to

appropriately weigh the evidence on the record [ECF 10]. The Commissioner moves that the

Court affirm the denial of benefits [ECF 11]. This Court reviews the Commissioner's final

decision pursuant to 42 U.S.C. § 405(g).

## I. PROCEDURAL BACKGROUND

Vanderkrol filed a Title II application for DIB on June 12, 2013, alleging a disability

onset date of March 1, 2013 [AR[1] 146–149]. The Commissioner initially denied his claim on

September 17, 2013 [AR 62–72], and again upon reconsideration on December 12, 2013 [AR

74–84]. Vanderkrol timely requested and received a hearing before Administrative Law Judge

(ALJ), Eric Basse, on January 27, 2015 [AR 27–61]. On March 25, 2015, the ALJ opined that

Vanderkrol was not disabled at any time between March 1, 2013 (alleged onset date) and March

---

[1] All citations to "AR" refer to the appropriate page of the administrative record.

25, 2015 (date of the ALJ's unfavorable decision) [AR 22]. On April 11, 2016, the

Commissioner's decision became final when the Appeals Council denied Vanderkrol's request

for review of the ALJ's decision [AR 1–8]. On June 9, 2016, Vanderkrol timely filed the

Complaint in this case to appeal the denial of benefits [ECF 1]. On September 1, 2016, this case

was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) [ECF 9]. This matter is fully briefed and ready for decision [ECF 10–12].

## II. FACTUAL BACKGROUND

Born October 3, 1966, Vanderkrol was forty-eight years old at the time of his ALJ

hearing [AR 30, 146]. Vanderkrol earned his high school diploma [AR 31] and completed

specialized meat classes in 2005 [AR 174]. Prior to his alleged disability onset date of March

2013, Vanderkrol worked as a chemical hauler for a fertilizer company in 2002, a laborer for a

car assembly factory from 2011–January 2013, a laborer for a concrete factory from 2002–2003,

a production manager for a meat packing factory from 2003–2010, and various odd jobs until

2001 [AR 174]. His peak annual earnings were $34,745.56 in 2012 [AR 168]. In early 2013, the

year of Vanderkrol's alleged disability onset date, he earned $1,792.00. Vanderkrol has not

worked since January 2013, when he was "let go" from his car assembly laborer job because of

his bad knees [AR 41].

In his 2013 Function Report, and at his 2015 ALJ hearing, Vanderkrol explained that he

prepared meals daily, cleaned, did the laundry, took care of his daughter, picked up his 18–20

pound grandson while sitting, drove his car, visited friends/family, went to church, and used a

brace every day (and sometimes a cane) to walk short distances or "a few blocks" [AR 33, 43,

44, 46, 47, 49–50, 194–204].

His mother filed a Third-Party Function Report in July 2013, noting that Vanderkrol "t[ook] care of self and daughter" [AR 206]. He dressed, bathed, groomed, shaved and fed himself; he also used the toilet independently [AR 206]. His young daughter (four years old as of July 2013) helped him do laundry [AR 207].

On his Pain Questionnaire in November 2013, Vanderkrol also noted that he cleaned and did laundry, but needed to constantly take breaks [AR 224]. He did "not attempt to lift heavy objects" [AR 224]. During Vanderkrol's ALJ hearing in January 2015, he testified that he could do light cleaning for 10–30 minutes at a time [AR 46]. He testified that his older daughter ran errands for him and gave his young daughter a bath sometimes, and his mother sometimes did his laundry and cleaned his place [AR 34, 45]. Because of his condition, Vanderkrol gave up his hobbies, which included hunting, fishing, and working out [AR 193, 201, 223].

In his June 26, 2013 Disability Report, Vanderkrol alleged disability due to a "blown out right knee, bad left knee, back pain, hypertension," as well as anxiety and depression [AR 173]. On Vanderkrol's July 7, 2013 Function Report, Vanderkrol listed several physical problems, including difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs [AR 202]. He also listed some mental problems, including difficulty completing tasks and concentrating [AR 202]. Vanderkrol's mother's Third-Party Function Report in July 2013, claimed that Vanderkrol had trouble standing, sitting, kneeling, and standing on tiptoes [AR 205]. During his 2015 ALJ hearing, Vanderkrol testified that he had some difficulty using stairs and he could not squat [AR 45]. He also testified that his "back gets to the point where [he] can't lift anything, can't bend, can't turn" [AR 35], and his neck gets to the point where he "can't turn" or lift his arms properly [AR 38]. Details about each of Vanderkrol's alleged disabilities are discussed below.

## A. Physical Medical History

### i. Knees

Vanderkrol has had problems with his knees for several years: as of December 2014, his right knee had been scoped five times. In the early 1990's he had ACL reconstruction on the right knee [AR 261, 263, 283, 349]. During his 2015 ALJ hearing, Vanderkrol testified that his "knees just don't, [his] right one especially [sic] it just won't hardly work" [AR 35]. On Vanderkrol's July 1, 2013 Pain Questionnaire, he claimed "intense pain constantly" in his right knee and "frequent pain" in his left knee [AR 192]. On his November 2013 Pain Questionnaire, Vanderkrol noted that he has "no mobility, no stability" [AR 223].

Phillip Clevenger, D.O., was Vanderkrol's primary doctor during the relevant period of alleged disability. Dr. Clevenger saw Vanderkrol for his knees, back, anxiety, and hypertension [AR 261, 264, 266, 269]. In Dr. Clevenger's March 2012 examination notes, he described Vanderkrol's knees as "horrible knees, especially the right knee" [AR 269]. He diagnosed Vanderkrol with degenerative joint disease in his knee, and noted that his right knee had deteriorated [AR 271]. Dr. Clevenger advised Vanderkrol that he should get a "desk job" that does not require a lot of education because he could not keep doing his "construction like job where he is on his feet a lot" for the "long term" [AR 269–271]. He refilled Vanderkrol's prescription medication of 500 mg. naproxen 2/day and 10 mg. oxycodone 4/day [AR 271].

During a November 19, 2012, follow-up appointment, Dr. Clevenger diagnosed Vanderkrol with "end stage degenerative arthritis of the knees" [AR 266]. Dr. Clevenger increased Vanderkrol's oxycodone prescription to 10 mg. 5/day to relieve his pain; he again encouraged Vanderkrol to get a different job. Vanderkrol talked "about trying to get a different occupation such as a truck driver" [AR 266].

In a January 2013 follow-up appointment, Dr. Clevenger ordered an X-ray of Vanderkrol's knees [AR 265]. X-rays, taken January 25, 2013, showed "moderate to severe osteoarthritis" of the right knee, and mild osteoarthritis of the left knee-cap tri-compartmental [AR 255–257]. Vanderkrol was next seen by Dr. Clevenger at an office visit in June 2013. His prescriptions were refilled, and Dr. Clevenger had a long conversation with him about what kind of desk job he might be able to get [AR 261].

During a State consultative examination in August 2013, Margaret J. Fehrle, M.D., noted that Vanderkrol walked with an antalgic gait[2] on the left and wore a brace on his right knee [AR 283]. His knees had normal flexion-extension [AR 280]. He experienced pain when his leg was raised at 90 degrees. Dr. Fehrle opined that Vanderkrol "would have trouble standing for a whole eight hour day. He would not be able to lift more than 10–20 pounds, and carry it for more than a limited amount during the day secondary to his right knee pain and instability" [AR 283].

Vanderkrol was again seen by Dr. Clevenger in September 2013; Dr. Clevenger noted that Vanderkrol was using crutches because of hip pain. Dr. Clevenger ordered an X-ray of Vanderkrol's pelvis and hip [AR 293]. X-rays came back negative for fracture, dislocation or significant soft tissue abnormality [AR 294–295]. On October 10, 2013, Dr. Clevenger saw Vanderkrol for a follow-up appointment; Vanderkrol reported that his hip pain "was 80 percent better just on anti-inflammatories" [AR 289–290]. During an October 2, 2014 follow-up appointment, Dr. Clevenger noted that Vanderkrol's knee pain was "deteriorated" [AR 304].

In June 2013 and October 2014, Dr. Clevenger completed a Report on Incapacity for the Iowa Department of Human Services where he opined that Vanderkrol was unable to perform

---

[2] An antalgic gait is a limp favoring one leg over the other in order to avoid pain. *Antalgic*, Merriam-Webster Dictionary (2017), https://www.merriam-webster.com/medical/antalgic (last visited Jan. 6, 2017).

any kind of work [AR 276–277, 296–297]. In December 2014, Dr. Clevenger submitted a Medical Source Statement of Ability to Do Work-Related Activities (Physical) to the State and opined that Vanderkrol could only occasionally lift or carry 10 pounds, that he could only stand or walk for less than two hours out of an eight-hour work day, he had limited ability to push or pull, he could not sustain a six-to-eight hour work day because of pain, and he could only reach occasionally (Dr. Clevenger did not describe how reaching was limited or give any medical or clinical findings, as was requested by the State: "It is very important to describe the factors that support your assessment. We are required to consider the extent to which your assessment is supported.") [AR 305–307].

During his 2015 ALJ hearing Vanderkrol testified that he tried a variety of treatments for the pain from his knees: he took hot baths and soaked his legs; he tried Bio-freeze ointment; Simms machine;[3] physical therapy; epidural steroid injections; and ice-packs [AR 37–46, 225]. He reported that soaking worked when applied, and the injections sometimes helped [AR 283]. He also wore a brace on his right leg, beginning around 2012 [AR 211]. Vanderkrol testified that his knee problems required him to use a cane occasionally and a brace regularly [AR 33]. As of January 2015, Vanderkrol took prescription medication: 10 mg. Oxycodone 3/day, 300 mg. Gabapentin 3/day, and 500 mg. Naproxen 2/day for pain relief [AR 248, 223].

---

[3] There is no explanation in the record as to what a "Simms machine" is, and a general internet search did not reveal a description of equipment a patient might use for a knee injury. It is possible that this was a mis-transcription of "TENS" machine. TENS is a transcutaneous electrical nerve stimulation machine that is used for nerve related pain relief. In any event, it can be concluded that Plaintiff continued to be seen by his treating physician and used exercise, non-invasive pain relief, steroid injections, and opioid pain medication for his knees.

## ii. Back, Neck, and Rotator Cuff

During Vanderkrol's ALJ hearing in January 2015, he testified that his back started hurting him "about 10 years ago" [AR 37]. He also testified that his "back gets to the point where [he] can't lift anything, cant bend can't turn" [AR 35], and his neck gets to the point where he "can't turn" or lift his arms properly [AR 38]. In his November 2013 Pain Questionnaire, Vanderkrol described his back pain as dull to severe constant pain [AR 222]. In his December 2014 treatment notes, Dr. Clevenger reported that Vanderkrol had right rotator cuff surgery, but did not indicate a date of surgery [AR 330].

Dr. Clevenger ordered an X-ray of Vanderkrol's cervical spine in 2007; the X-ray showed the C2-3, 3-4, 4-5, and C7 levels were normal; the C5-6 level showed some proximal foraminal narrowing, the C6-7 level showed a central subligamentous disc bulge and mild narrowing of the proximal foraminal on the left [AR 252]. Vanderkrol has not been given specific treatment for his cervical spine degeneration; however, the pain medications for his knees and chronic pain generally also apply to his cervical spine pain.

On January 25, 2013, Dr. Clevenger noted that Vanderkrol had a history of chronic back problems [AR 263]. The record does not mention any X-ray of Vanderkrol's lower back. In June 2013, Dr. Clevenger opined that Vanderkrol had degenerative disk disease of neck and back [AR 261].

In August 2013, Margaret Fehrle, M.D., the State consulting examiner, reported Vanderkrol had 30 degrees less flexion in his lumbar spine than normal, a 10 degrees less flexion in his cervical spine and rotation, and an unremarkable degree shift in his shoulders [AR 280–281]. Dr. Fehrle noted that Vanderkrol reported that he has gotten epidural steroid injections in his back and that "the first one didn't work and the 2nd [sic] one worked some" [AR 283]. At the

7

2015 ALJ hearing, Vanderkrol testified that the injections did not work at reducing his pain [AR 35].

In December 2014, Vanderkrol complained of back pain and X-rays indicated an enlarged kidney and tumor; Vanderkrol had a nephrectomy, or left kidney removal, on December 12, 2014, and was discharged on December 16, 2014 [AR 320–325]. Just prior to surgery, Dr. Clevenger noted that Vanderkrol had decreased range of motion in his back and neck [AR 331]. After surgery, surgeon Kevin K. Birusingh, D.O., ordered Vanderkrol not do any strenuous activity for six weeks [AR 320]. He was told to resume home anti-inflammatory medications for back pain [AR 355].

### iii. Hypertension

Vanderkrol has a history of hypertension [AR 15, 291, 265]. As of January 2015, Vanderkrol took 10 mg. Amlodipine besylate daily and 1 mg. clonidine 3/day to treat his hypertension [AR 248]. In March 2012, Dr. Clevenger measured his blood pressure at 110/70, and noted that his "pressure is so good today" [AR 271]. In November 2012, Dr. Clevenger again measured his blood pressure at 110/70 [AR 265]. In September 2013, Dr. Clevenger measured his blood pressure was 154/64 [AR 291]. In October 2014, his blood pressure was measured at 130/80 [AR 303].

### B. Mental Health Medical History

In June 2013, Dr. Clevenger diagnosed Vanderkrol with situational anxiety, but did not prescribe any medications or other treatment [AR 262]. Dr. Clevenger noted that Vanderkrol looked "dysphoric" after his job loss [AR 263]. During the initial Disability Determination, Vanderkrol was interviewed Jennifer Hartman on August 29, 2013; Vanderkrol denied treatment

for depression and anxiety, and testified that anxiety does not prevent him from working [AR 66–67]. During his 2015 ALJ hearing, Vanderkrol explained that he has trouble concentrating, but that he does lots of reading [AR 50].

## II. ALJ DECISION

In order to qualify for benefits under the Act, Vanderkrol must have been disabled. Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The ALJ used a five-step sequential evaluation to determine that Vanderkrol was not disabled within the meaning of the Act[4] [AR 12–22]. On March 25, 2015, the ALJ issued a decision denying Vanderkrol's claim for DIB under Title II of the SSA [AR 22]. Adhering to the requisite five-step evaluation, the ALJ made the following findings:

- The claimant has not engaged in substantial gainful activity since March 1, 2013, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).

---

[4] 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012) provides that "(i) [a]t the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . . (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement of § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . . (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [subpart P of part 404 of this chapter] and meets the duration requirement, we will find that you are disabled. . . . (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . . (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled."

- The claimant has the following severe impairments: degenerative disk disease of the lumbar and cervical spine; degenerative joint disease of the knees, status-post surgery (20 CFR 404.1520(c)).

  [The ALJ found that Vanderkrol's kidney condition was not severe because treatment notes indicated that that the kidney removal operation would only minimally affect Vanderkrol after six weeks of recovery [AR 14]. Vanderkrol's rotator cuff condition was nonsevere because even though Vanderkrol's primary physician opined that the condition limited Vanderkrol to reaching only on an occasional basis, the opinion was inconsistent with the physician's own treatment notes, Vanderkrol did not originally list his rotator cuff as a problem, and examination in 2013 showed Vanderkrol had nearly normal range of motion in his shoulder [AR 14–15]. Vanderkrol's hypertension was nonsevere because it was controlled with medication [AR 15]. Vanderkrol's anxiety was nonsevere after evaluating his anxiety under "the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments": daily living, social functioning, concentration, and decompensation [AR 15]].

- The claimant does not have an impairment or combination of impairments that met or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

- [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except he can occasionally climb ramps and stairs. He should avoid ladders, ropes and scaffolds. He can occasionally balance and stoop. He should avoid kneeling, crouching, and crawling. He can frequently handle and finger with his bilateral upper extremities. He should avoid extremes of heat and cold. The individual should avoid exposure to hazards such as machinery and heights. He is able to occasionally push and pull and use foot controls with his bilateral lower extremities within sedentary weight limits. He can sit 30 minutes at a time and then should be able to stand 2 or 3 minutes at the workstation. [The ALJ gave some weight to the 10 pounds occasional lifting limit by limiting Vanderkrol to sedentary work].

- The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

- The claimant was born on October 3, 1966 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability date (20 CFR 404.1563).

- The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

10

- Transferability of job skills is not material to the determination of disability because using the Medical-vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

- Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

- The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2013, through the date of this decision (20 C.F.R. § 404.1520(g)).

(AR 12–22).

## III.   STANDARD OF REVIEW

The Court upholds an ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006) (internal quotations omitted)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (reasoning that substantial evidence means "more than a mere scintilla"). The Court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010). If substantial evidence supports the ALJ's decision, the Court will not reverse merely because substantial evidence exists in the record that would support a contrary outcome, or because the Court would have determined the case differently. *Davidson v. Astrue*, 578 F.3d 838, 841–42 (8th Cir. 2009) (citing *England v. Astrue,* 490 F.3d 1017, 1019 (8th Cir. 2007)); *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011).

The Court also reviews the Commissioner's decision to determine if there was a

procedural error, an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed *de novo*, with deference accorded to the Commission's construction of the Social Security Act. *See Petersen v. Astrue*, 633 F.3d 633, 636 (8th Cir. 2011) (citing *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992)).

## IV.   DISCUSSION

Vanderkrol moves to reverse the ALJ's decision because the ALJ erred: a) in calculating his RFC by incorrectly weighing the treating physician's opinion evidence and discounting his subjective complaints of pain; and b) in finding that there was a significant amount of work in the national economy that he could perform because the finding was based on a faulty RFC.

### A. The ALJ Appropriately Calculated Vanderkrol's RFC

Vanderkrol argues that the ALJ erred in calculating his RFC because the ALJ inappropriately weighed the opinion evidence and discounted his subjective complaints of pain. It is Vanderkrol's burden to establish his RFC on the record. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *see also Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). In making the RFC determination, the ALJ must consider the record as a whole, including Vanderkrol's credible subjective complaints regarding exertional and nonexertional impairments, doctor's opinions, and the objective medical record or lack of objective medical records regarding his alleged impairments. *Galbreath v. Colvin*, 515 F. App'x 641, 642 (8th Cir. 2013) (citing *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2007)). At issue is whether substantial evidence supports the ALJ's decision to give Vanderkrol's treating physician's opinions some

weight; the decision to discount Vanderkrol's subjective complaints; and the ultimate RFC determination that limited Vanderkrol to sedentary work.

Vanderkrol argues that the ALJ did not fully consider his treating physician Dr. Clevenger's opinions, and should have assigned them controlling weight or greater weight. Ordinarily, a treating doctor's medical opinion is entitled to controlling weight if "it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007) (quotation omitted); 20 C.F.R. § 404.1527(c). "[O]pinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000). If a treating-source is not entitled to controlling weight, it is weighed along with the other medical opinions pursuant to 20 C.F.R. § 404.1527(c)(2). According to 20 C.F.R. § 404.1527, the ALJ must consider all medical opinions in a case record, but give more weight to an opinion if the source examined the claimant, has a treatment relationship with the claimant, is supported by laboratory findings/evidence, and supporting explanations for their opinions. If the ALJ chooses to weigh the opinion evidence differently, the ALJ must explain why he departed from the hierarchical norm. *See Davis v. Schweiker*, 671 F.2d 1187, 1189 (8th Cir. 1982).

The ALJ thoroughly considered Dr. Clevenger's opinions, and spent more than three pages discussing his treatment notes. The ALJ gave Dr. Clevenger's opinions some weight when appropriate, and no weight when the opinions were conclusory or not medical.

The ALJ assigned some weight to Dr. Clevenger's March and November 2012 opinions that Vanderkrol needed a desk job [AR 18]. The ALJ RFC determination limiting Vanderkrol to sedentary work reflects that opinion. The ALJ assigned no weight to Dr. Clevenger's June 2013

and October 2014 opinions that Vanderkrol could not work at all, because opinions about the

ability to work are reserved for the Commissioner, 20 C.F.R. 404.1527(d)(1), the doctor's

opinions about the inability to work were not supported by medical findings, and the opinions

were inconsistent with his prior treatment notes [AR 19]. The ALJ assigned some weight to Dr.

Clevenger's December 2014 opinions and included the recommended limitations in the assigned

RFC; the ALJ included Dr. Clevenger's opinions regarding Vanderkrol's limited ability to carry

10 pounds occasionally (even though Vanderkrol testified to lifting 18–20 pounds during his

2015 ALJ hearing); stand less than two hours during an eight-hour workday; that Vanderkrol

would need to alternate positions periodically (Vanderkrol's RFC included a 30 minute sitting

period limitation); and should avoid kneeling, crouching, crawling, and stooping [AR 19]. These

opinions are consistent with those of the State consultative orthopedic examining physician, Dr.

Fehrle. However, the ALJ found that Dr. Clevenger's opinion that Vanderkrol could not sustain a

six-to-eight hour workday, five days a week, inconsistent with Dr. Clevenger's own treatment

notes and the record as a whole, including the fact that Dr. Clevenger did not prescribe

medication or treatment for situational anxiety or depression.

The ALJ appropriately determined that Dr. Clevenger's opinions were not entitled to

controlling weight because some of Dr. Clevenger's opinions were conclusory, not substantiated

by medical findings or treatment notes, and inconsistent with other findings.

Substantial evidence on the record supports the ALJ's decision to not assign controlling

weight to all of Dr. Clevenger's opinions. Dr. Clevenger stated that Vanderkrol was limited in

work partially due to a rotator cuff problem [AR 306]. However, Vanderkrol did not initially list

shoulder/rotator cuff as a problem on his disability application, or describe shoulder pain in his

Pain Questionnaire or ALJ hearing [AR 173, 192, 222]. Neither Dr. Clevenger, nor Dr. Fehrle,

listed a shoulder/rotator cuff problem on their diagnosis list or in medical reports, except that Dr. Clevenger mentioned that Vanderkrol complained of "left shoulder problems" in his September 2013 treatment notes [AR 261–262, 263–265, 265–267, 267–271, 289–290, 296]. The medical history shows that Vanderkrol had right rotator cuff surgery at some point in his treatment. An August 2013 physical examination revealed that Vanderkrol had nearly normal range of motion in his shoulders [AR 280].

Dr. Clevenger's opinion about the degree of limitation in movement, and resulting work limitation, is inconsistent with his treatment notes and medical evidence. Dr. Clevenger's September 2013 exam found Vanderkrol had "a little tenderness on the left sacroiliac joint, but the rest of the spine appears to be fine" [AR 291]. In October 2013, Dr. Clevenger noted that Vanderkrol's neck problems were "stable" [AR 289]. Dr. Clevenger labeled Vanderkrol's knee degeneration as "end stage"; X-rays showed moderate to severe degeneration. While the 2007 X-ray on Vanderkrol's cervical spine showed some degeneration, specifically, the C5-6 level showed some proximal foraminal narrowing and the C6-7 level showed mild narrowing of the proximal foraminal, the showings of mild degeneration do not account for an inability to lift, or an inability to work a six-to-eight hour workday, five days a week, even in conjunction with all medically credible impairments.

Additionally, Dr. Clevenger's notes in March 2012, November 2012, and June 2013 indicate that Dr. Clevenger believed Vanderkrol was capable of a desk job, if he could obtain one [AR 261, 266, 269–271]. Opinions about the ability/inability to work are reserved for the Commissioner. 20 C.F.R. 404.1527(d)(1). The vocational expert and the ALJ considered Vanderkrol's education level when determining that there were jobs available in the national economy that Vanderkrol could perform. The ALJ appropriately weighed the opinion evidence

for medical support of the claims, along with inconsistencies with the medical evidence on the record, and appropriately relied upon the consistent medical opinions when determining Vanderkrol's RFC.

Vanderkrol also argues that the ALJ erred by discounting his subjective complaints regarding his pain. The ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" [AR 18].

In determining RFC, the ALJ must consider subjective complaints, objective medical evidence, and other evidence including the individual's daily activities, medications and treatments, and aggravating/precipitating factors. 20 C.F.R. § 404.1529(c). The Court will defer to the ALJ's credibility finding if the ALJ "explicitly discredits a claimant's testimony and gives a good reason for doing so." *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011)(quotation marks and citation omitted); *see Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.") (quotation marks and citation omitted). The ALJ considered the record as a whole, and appropriately evaluated the credibility of Vanderkrol's subjective complaints in light of the claimant's daily activities, alleged pain, medications, and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Subjective statements alone are not enough to establish a physical impairment. *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); 20 C.F.R. § 416.928.

Vanderkrol's statements regarding his alleged limitations were at times inconsistent. During his 2013 consultative examination, Vanderkrol reported that injections had helped his

back pain; during his 2015 ALJ hearing he claimed that injections had been ineffective. In his 2013 Pain Questionnaire, Vanderkrol claimed that he never attempted to lift heavy objects; in his 2015 ALJ hearing, Vanderkrol admitted to lifting his 18–20 pound grandson while seated. In his 2013 Function Report, Vanderkrol claimed to have difficulty concentrating on tasks because of his pain; in his 2015 ALJ hearing, Vanderkrol claimed to read novels regularly.

Treatment notes, objective medical evidence, and Vanderkrol's daily activities do not support the degree of limitation alleged at Vanderkrol's 2015 ALJ hearing, where he testified that his "back gets to the point where [he] can't lift anything, can't bend, can't turn" [AR 35], and his neck gets to the point where he "can't turn" or lift his arms properly [AR 38]. On his November 2013 Pain Questionnaire, Vanderkrol claimed to have "no mobility [or] stability" [AR 223].

During a 2013 exam, Dr. Clevenger noted that Vanderkrol had some tenderness in part of his back, but the rest of the spine was fine. Dr. Clevenger also noted that his neck was stable. X-rays of Vanderkrol's neck show mild degeneration. In the same year, Dr. Fehrle reported Vanderkrol had thirty degrees less flexion in his lumbar spine than normal, a ten degrees less flexion in his cervical spine and rotation, and an unremarkable degree shift in his shoulders [AR 280 – 281]. Vanderkrol admitted that his pain lessened in his hips by around eighty percent after taking over-the-counter anti-inflammatory medication. Other than using a leg-brace, Vanderkrol has walked without an aid, except for a brief time when he was having hip trouble. Vanderkrol's admitted activity is inconsistent with his statements that he has no mobility or stability. In his 2013 Function Report and his 2015 ALJ hearing, Vanderkrol explained that he prepared meals daily, cleaned, did the laundry, took care of his young daughter, picked up his 18–20 pound grandson while sitting, drove his car, visited friends/family, went to church, and used a brace

every day (and sometimes a cane) to walk short distances or "a few blocks" [AR 33, 43, 44, 46, 47, 49–50, 194–204]. His mother filed a Third-Party Function Report in July 2013, noting that Vanderkrol "t[ook] care of self and daughter" [AR 206]. He dressed, bathed, groomed, shaved and fed himself; and he also used the toilet independently [AR 206]. The ALJ appropriately weighed the whole record and found that Vanderkrol's statements regarding the degree, persistence, and limiting effects of his impairments were not entirely credible.

### B. The ALJ Appropriately Determined That There Was A Significant Amount of Work in the National Economy That Vanderkrol Could Perform

Vanderkrol alleges that the ALJ erred in finding there was a significant amount of work in the national economy that he could perform because the ALJ based that determination on a hypothetical that was based on a flawed RFC. The ALJ relied on the vocational expert's response to the following hypothetical:

> [C]laimant's age, education and past work, sedentary work as that term is defined in the DOT, occasional climb ramps and stairs, no ladders, ropes and scaffolds, occasionally balance, occasionally stoop, no kneeling, no crouching, no crawling, avoid extremes of heat and cold, avoid concentrated exposure to hazards and the standard hazards, dangerous machinery, unprotected heights, only occasional pushing and pulling of foot controls and any pushing, pulling has to be within the sedentary weight limits and stand would need to stand after, could sit for 30 minutes and then would need to stand for a minute or two at the work station before sitting down again, okay.

[AR 56]. The vocational expert found that such an individual could work as a ticket counter, a telephone quotation clerk, a document preparer, and a surveillance systems monitor. When asked whether an occasional reaching limitation would affect one's ability to perform those job titles, the vocational expert found that only about 4,000 surveillance system monitor jobs would be nationally available. The ALJ properly determined Vanderkrol's RFC. The hypothetical fairly

stated Vanderkrol's impairments. The ALJ met his burden of showing that there were jobs in that national economy that Vanderkrol could perform.

## V.  CONCLUSION

The ALJ did not err in finding that Vanderkrol did not qualify for disability insurance benefits. The ALJ's findings were supported by substantial evidence on the record, including the objective medical evidence. The ALJ appropriately determined Vanderkrol's RFC, and that there was a significant amount of work that Vanderkrol could perform in the national economy. The ALJ properly used a hypothetical about a person with Vanderkrol's limitations to obtain the vocational expert's testimony. The ALJ appropriately weighed the physician's opinions and determined credibility. Vanderkrol's alleged intensity, persistence, and limiting effects of his claimed impairments were adequately considered, but discounted, because substantial evidence on the record was inconsistent with Vanderkrol's subjective allegations.

## VI.  REPORT AND RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED that the Commissioner's decision to deny Vanderkrol disability insurance benefits be affirmed.

IT IS ORDERED that the parties have until January 24, 2017, to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. 636(b)(1)(C). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *see also Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995). Failure to timely file objections may constitute a waiver of Plaintiff's right to appeal questions of fact. *United*

*States v. Kelley*, 774 F.3d 434, 439 (8th Cir. 2014) (citing *Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

Dated this 10th day of January, 2017.

*Celeste F Bremer*
_____
CELESTE F. BREMER
CHIEF UNITED STATES MAGISTRATE JUDGE